UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

TAMERA S. JOHNSON,      )
        )
    Plaintiff,      )
        )
v.        )      CAUSE NO. 1:15-cv-00310-SLC
        )
COMMISSIONER OF SOCIAL      )
SECURITY,      )
        )
    Defendant.      )

## OPINION AND ORDER

Plaintiff Tamera Johnson appeals to the district court from a final decision of the

Commissioner of Social Security ("Commissioner") denying her application under the Social

Security Act (the "Act") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI").[1] (DE 1). For the following reasons, the Commissioner's decision will be

AFFIRMED.

## I. PROCEDURAL HISTORY

Johnson applied for SSI in September 2012 and for DIB in October 2012, alleging

disability as of March 3, 2011. (DE 11 Administrative Record ("AR") 167-75). The

Commissioner denied Johnson's application initially and upon reconsideration. (AR 110-25).

After a timely request, a hearing was held on March 13, 2014, before Administrative Law Judge

Patricia Melvin ("the ALJ"), at which Johnson, who was represented by counsel, and a

vocational expert, Micha Daoud (the "VE"), testified. (AR 33-65). On June 3, 2014, the ALJ

rendered an unfavorable decision to Johnson, concluding that she was not disabled because

---

[1] All parties have consented to the Magistrate Judge. (DE 17); *see* 28 U.S.C. § 636(c).

despite the limitations caused by her impairments, she could perform her past relevant work as a sales clerk, cleaner, and telemarketer. (AR 17-27). The Appeals Council denied Johnson's request for review (DE 5-9), at which point the ALJ's decision became the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1481.

Johnson filed a complaint with this Court on October 23, 2015, seeking relief from the Commissioner's final decision. (DE 1). In this appeal, Johnson argues that the residual functional capacity ("RFC") assigned by the ALJ is not supported by substantial evidence because it purportedly was based on the ALJ's improper lay interpretation of the medical evidence. (DE 16 at 3-7).

## II. FACTUAL BACKGROUND[2]

At the time of the ALJ's decision, Johnson was 53 years old (AR 27, 167); was a high school graduate and had attended some college (AR 38, 192); and possessed past work experience as a retail sales clerk, warehouse worker, and security guard (AR 193, 229). At the time of her application, Johnson alleged disability due to a back injury, degenerative disc disease, fibromyalgia, and abdominal issues. (AR 191). Johnson advances an alleged onset date of March 3, 2011—the date she was terminated from her last job for "other reasons."[3] (AR 192).

### A. *Johnson's Testimony at the Hearing*

At the hearing, Johnson, who was five feet, five inches tall and weighed 200 pounds, testified that she lived alone. (AR 37). She was receiving financial help from her two adult sons

---

[2] In the interest of brevity, this Opinion recounts only the portions of the 371-page administrative record necessary to the decision.

[3] Curiously, despite advancing an alleged onset date of March 3, 2011, Johnson states in her Disability Report that it actually was not until August 1, 2012, that her conditions became severe enough to keep her from working. (AR 192).

and her friends, as she was not insured, had no income, and was not receiving public assistance at the time.  (AR 37).  She drives herself to appointments and had driven herself to the hearing.  (AR 56).  She performs her bathing and dressing independently.  (AR 56).  She adequately performs household tasks such as cooking, doing dishes, laundry, vacuuming, and shopping, but her neighbor helps her by maintaining the lawn and taking out the garbage.  (AR 57-58).  Her hobbies are surfing the internet and watching crime shows on television.  (AR 56-57).  When asked to describe a typical day, Johnson stated that she sits in a recliner in the living room, surfs the internet, prepares light meals, watches television, and lies in bed and tries to sleep.  (AR 58-59).

When asked why she thought she could not work, Johnson cited headaches and constant pain in her low back, legs, feet, shoulders, and chest.  (AR 44).  She stated that she experiences numbness in her legs if she walks or sits too long; several times a week, her leg numbness causes her to start to fall, and she has to catch herself on furniture.  (AR 44, 47-48, 56).  She rated her back pain on a 10-point scale as an "eight" on an average day with medication; she feels "extreme pain" and "can't move" when without medication  (AR 45-46).  Her fibromyalgia causes constant dull pain in her shoulders, which she rated as a "five" or a "six," as well as sharp pains several times a week in her chest, shoulders, and head.  (AR 49, 51-52).  She told her doctor about the sharp pains, but she has not been treated for them due to her lack of insurance.  (AR 52).  Her fibromyalgia makes just putting her feet on the floor very painful; she rated her constant foot pain as a "six" with Cymbalta 30 and a "10" without.  (AR 49-50).  Using her arms intensifies her pain, so she "just do[es]n't use them."  (AR 50).  She also has constant neck pain, which she believes causes her headaches.  (AR 51-53).  Her neck issues cause intermittent

numbness in her hands and elbows on a daily basis; if she stops using her hands, the numbness subsides.  (AR 51).

Johnson stated that she has undergone only "[m]inimal treatment" for her conditions, including consulting a pain management clinic and a free clinic when available, participating in physical therapy, receiving spinal injections, and taking medications.  (AR 45-46).  She was taking Cymbalta and Opana at the time, which "take the edge off" her pain, but did not eliminate it (AR 46, 49); she was not taking any medications specifically for her headaches (AR 53). Cymbalta 30 causes her side effects of extreme fatigue, so she had just been prescribed Cymbalta 20.  (AR 46, 49).  Lying down in one position, sitting too long, walking, and standing all aggravate her pain; nothing she can do at home, other than using a heating pad, relieves or reduces her pain.  (AR 46-47, 50).

Johnson estimated that she could walk 70 feet, stand for 10 minutes, sit in one position for five minutes, and lift from three to five pounds.  (AR 54).  She stated that she has problems with her balance and often feels lightheaded.  (AR 55-56).  She has difficulty reaching overhead with her left arm and pushing the gas and brake pedals while driving.  (AR 54-55).  She stated that she could not climb stairs without assistance, but conceded that she could climb the three stairs to her porch when using a railing.  (AR 55).  She claimed that she drops items every day, such as glasses of water and the remote control, and has difficulty with buttons, zippers, and shoelaces.  (AR 53, 55).

### B.  Summary of the Relevant Medical Evidence

On January 10, 2011, Johnson presented to the emergency room with a one-week history of left-sided chest pain.  (AR 239-40).  All cardiac and pulmonary tests were normal.  (AR 241,

246).  She was treated with aspirin and Percocet.  (AR 241).

On April 13, 2011, Johnson returned to the emergency room for a headache.  (AR 248-49).  She stated that Aleve was helping but that she felt lightheaded.  (AR 248).  She believed that she needed blood pressure medication, but the free clinic was closed and the urgent care center sent her to the emergency room.  (AR 248-49, 277).  A head CT, chest X-ray, and cardiac exam were normal.  (AR 250).  A preliminary drug screen was positive for methamphetamine or ecstasy, which she could not explain.  (AR 250).  She was given a prescription for blood pressure medication and directed to follow up at the free clinic.  (AR 250).

On May 18, 2011, Johnson visited the Faith Community Health Clinic for a four-month history of headaches and neck pain.  (AR 280).  She reported a history of fibromyalgia.  (AR 280).  She returned to the Faith Community Health Clinic on August 24, 2011, for a bee sting, and she requested documentation of degenerative disc disease and fibromyalgia.  (AR 280).  On September 21, 2012, Johnson visited the clinic for soreness in her right ankle and back of her left leg, stating that she wanted to try Lyrica for her pain.  (AR 279).  She requested paperwork for her disability application.  (AR 279).

On October 5, 2012, Johnson went to the emergency room for right flank pain.  (AR 262-63).  The physician could find no clear etiology for her symptoms.  (AR 264).  She was given pain medication and directed to follow up at the free clinic.  (AR 264).  The following month, Johnson returned to the Faith Community Health Clinic; she was able to move all four extremities when talking with the doctor, demonstrated full strength in all extremities, and ambulated without difficulty when leaving the exam room.  (AR 278).  She was assessed with right flank pain and fibromyalgia and was prescribed Flexeril.  (AR 278).

On November 20, 2012, Johnson presented to Vijay Kamineni, M.D., for a disability physical. (AR 296-300). Her chief complaint was upper and lower back pain and multiple painful joints, reporting that her pain was "10/10" at times. (AR 296). She told Dr. Kamineni that she had been diagnosed with degenerative disc disease in 1993 and fibromyalgia in 2008. (AR 296). On physical exam, she had tenderness to palpation in the lumbosacral spine, but no muscle pain or weakness; her muscle strength and grip strength were "5/5." (AR 298). She had normal range of motion in sitting, but said she could not move her legs in supine. (AR 300). Although she complained of fine motor difficulties, no fine motor deficiencies were observed during the examination. (AR 299). At the end of his report, Dr. Kamineni articulated the following medical source statement:

> The patient states she cannot sit for 30 minutes. She states she cannot stand for 30 minutes. She states she can carry 20 pounds. She is able to walk 6 minutes. She states she cannot lift 10 pounds over her head. She can step up an 8 inch step. [She] has normal fine motor skills with normal handling of fine objects. Normal concentration and social interaction. Remote and recent memory intact. Normal hearing, speech and vision.

(AR 298).

X-rays of Johnson's lumbar spine in December 2012 showed disc height loss at L4-5 and L5-S1, but alignment was maintained and there was no compression deformity. (AR 307). X-rays of her hands were normal. (AR 307).

On December 20, 2012, R. Bond, M.D., a state agency physician, reviewed Johnson's record and concluded that she could lift 10 pounds frequently and 20 pounds occasionally; stand or walk six hours in an eight-hour workday; sit for six hours in an eight-hour workday; frequently balance and climb ramps and stairs; occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds; must avoid concentrated exposure to fumes, odors, dusts,

gases, and poor ventilation; and must avoid even moderate exposure to hazards such as dangerous machinery and unprotected heights.  (AR 71-73).

On February 13, 2013, Johnson began seeing Thomas Miller, M.D., for complaints of back pain.  (AR 308-09).  A straight-leg raising test on the left was positive; she had no tenderness on palpation or spasms of the lumbosacral spine, but she did exhibit left thigh weakness.  (AR 308-09).  Dr. Miller assessed sciatica, and he ordered an MRI of her spine, which revealed a Schmorl's node of the L4 inferior endplate with adjacent marrow edema and mild-to-moderate spondylosis of the lower lumbar spine with narrowing of the inferior foraminal recesses at the L4-5 and L5-S1 levels.  (AR 309, 314).  On February 25, 2013, Johnson returned to Dr. Miller to follow up on her MRI results.  (AR 310-11).  She complained of tingling in both legs and numbness from the waist down; however, her gait and stance were normal.  (AR 310). Dr. Miller assessed lumbar spondylosis and peripheral neuropathy, and referred her to a neurologist.  (AR 310-11).  On March 8, 2015, Johnson returned to Dr. Miller for abdominal pain.  (AR 312-13).  On exam, musculoskeletal system findings were normal other than some tenderness on the plantar aspect of both feet.  (AR 312).  Dr. Miller assessed degenerative disc disease.  (AR 313).

On March 27, 2013, J. Sands, M.D., another state agency physician, reviewed Johnson's record and articulated the same conclusions as Dr. Bond.  (AR 105-07).

Johnson received a lumbar epidural in both May and June 2013.  (AR 346).  She experienced 40% pain improvement for one week with the first epidural and 50% pain improvement for one week with the second epidural.  (AR 346).

On June 18, 2013, Johnson saw Kelly Anderson, a nurse practitioner at the Centers for

Pain Relief, reporting low back pain and insomnia, but no numbness or tingling. (AR 360-64). Johnson rated her constant low back pain as an "8/10," describing it as "burning, shooting and stabbing." (AR 360). She also reported constant pain in all of her joints, rating it as a "4/10" at the time, but stating that it increases to "7/10." (AR 360). Her pain was aggravated by any movement and reduced by prescription medications. (AR 360). On examination, Johnson had pain with flexion; bilateral sacroiliac joint, lumbar facet, and myofascial tenderness; positive straight-leg raising, torque, and Patrick's tests; and a slow, wide-based gait. (AR 362). She was able to sit comfortably on the examination table without difficulty or evidence of pain. (AR 362). Ms. Anderson prescribed Baclofen and Percocet. (AR 363).

Johnson returned to Ms. Anderson on July 16, 2013, reporting that the Percocet gave her migraines and made her feel "loopy." (AR 355-59). Her examination results were similar to her previous visit. (AR 356-58). Ms. Anderson discontinued the Percocet and prescribed Opana and Baclofen. (AR 359). Johnson returned to Ms. Anderson on August 27, 2013, reporting low back and joint pain, but no numbness or tingling. (AR 350-54). She denied any side effects from her current medications. (AR 351). She stated that her pain had improved by 40%, as well as her ability to walk, do housework, and sleep. (AR 351). Examination results were similar as at her last visit. (AR 352-53). Ms. Anderson discontinued the Baclofen, but continued the Opana. (AR 354).

On November 1, 2013, Johnson saw William Hedrick, M.D., at the Centers for Pain Relief, reporting an overall percentage of improvement of 40%. (AR 345-49). She denied any side effects from her current medications, Opana and Cymbalta (20 mg). (AR 346). Examination results were similar to those documented by Ms. Anderson. (AR 345-48). Dr.

Hedrick assessed lumbar pain, lumbar/thoracic radiculopathy, unspecified joint pain, and chronic pain syndrome. (AR 348). He prescribed Cymbalta and Nucynta, and instructed Johnson to begin a regular low impact exercise program. (AR 349). Dr. Hedrick indicated that Johnson was tolerating her medications and that they helped her to maintain her activities of daily living and her ability to work. (AR 348). He expressed an ultimate goal of further reduction of opioids as Johnson improved with positive lifestyle changes. (AR 348-49).

On November 12, 2014, Johnson saw Dr. Hedrick for spinal injections. (AR 343). She was seen several days later by Gay Watson, another nurse practitioner at the Centers for Pain Relief. (AR 338-42). Examination findings were similar to Ms. Anderson's previously. (AR 338-41). Johnson had normal reflexes but decreased sensation to light touch in her left lower leg. (AR 340). She denied experiencing any side effects from her current medications, including any excessive drowsiness. (AR 339). Ms. Watson prescribed Opana and Cymbalta. (AR 342). The following month, Ms. Anderson saw Johnson again, making similar observations and diagnoses. (AR 333-37). Johnson again denied experiencing any medication side effects. (AR 334). Ms. Anderson continued Johnson's prescriptions of Opana and Cymbalta. (AR 337).

On March 11, 2014, Dr. Hedrick completed a questionnaire regarding Johnson's functional capacity. (AR 368-71). He opined that Johnson could lift and carry 10 pounds occasionally and less then 10 pounds frequently; stand for less than two hours in an eight-hour period; sit for about two hours in an eight-hour period; occasionally twist, stoop, and bend, but never crouch or climb ladders or stairs; must change position after sitting for five to 10 minutes and after standing for five minutes; must walk around for five minutes every 15 minutes; must be able to shift at will from sitting, standing, or walking; and must lie down at unpredictable

intervals during an eight-hour period. (AR 368-69). Dr. Hedrick also found limitations in

kneeling, balancing, and crawling, stating that Johnson becomes lightheaded at times. (DE 369).

Additionally, he stated that Johnson had limitations in reaching, fingering, handling, feeling, and

pushing/pulling, indicating that she frequently drops items and had decreased sensation in her

left thumb. (AR 369). He wrote that Johnson's symptoms were severe enough that they would

constantly interfere with the attention and concentration needed to perform simple work-related

tasks. (AR 369). He estimated that she would miss more than four days per month as a result of

her impairments. (AR 360). He indicated that the foregoing symptoms and limitations had

begun in 1980 after a fall from a porch. (AR 369). Dr. Hedrick cited the following medical

findings in support of these limitations: lumbar radiculopathy; lower back pain; multiple

abdominal surgeries; sacroiliitis; and carpel tunnel syndrome, together with positive Phalen's

and Tinel's tests, in her left hand. (AR 368-701).

### III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

[Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). The

Court's task is limited to determining whether the ALJ's factual findings are supported by

substantial evidence, which means "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)

(citation omitted). The decision will be reversed only if it is not supported by substantial

evidence or if the ALJ applied an erroneous legal standard. *Clifford v. Apfel*, 227 F.3d 863, 869

(7th Cir. 2000) (citation omitted).

To determine if substantial evidence exists, the Court reviews the entire administrative record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.* Rather, if the findings of the Commissioner are supported by substantial evidence, they are conclusive. *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003) (citation omitted). "In other words, so long as, in light of all the evidence, reasonable minds could differ concerning whether [the claimant] is disabled, we must affirm the ALJ's decision denying benefits." *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

## IV. ANALYSIS

### A. *The Law*

Under the Act, a claimant is entitled to DIB or SSI if she establishes an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1), 423(d)(1)(A), 1382c(a)(3)(A). A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App'x 1; (4) whether the claimant is unable to perform her past work;

and (5) whether the claimant is incapable of performing work in the national economy.[4]  *See Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) (citations omitted); 20 C.F.R. §§ 404.1520, 416.920.  An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled.  *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (citation omitted).  A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled.  *Id.* (citation omitted).  The burden of proof lies with the claimant at every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868 (citation omitted).

### B.  The Commissioner's Final Decision

On June 3, 2014, the ALJ issued the decision that ultimately became the Commissioner's final decision.  (AR 17-27).  At step one of the five-step analysis, the ALJ found that Johnson had not engaged in substantial gainful activity since her alleged onset date.  (AR 19).  At step two, the ALJ found that Johnson's degenerative disc disease and fibromyalgia were severe impairments.  (AR 19).  At step three, the ALJ concluded that Johnson did not have an impairment or combination of impairments severe enough to meet or equal a listing.  (AR 21-23).

Before proceeding to step four, the ALJ determined that Johnson's symptom testimony was not entirely credible, and the ALJ assigned her the following RFC:

> [T]he claimant has the [RFC] to perform less than a full range of light work . . . .
> She can lift/carry 20 pounds occasionally and 10 pounds frequently; stand/walk
> for six hours in an eight hour workday; sit for six hours in an eight hour workday;

---

[4] Before performing steps four and five, the ALJ must determine the claimant's RFC or what tasks the claimant can do despite her limitations.  20 C.F.R §§ 404.1520(e), 404.1545(a), 416.920(e), 416.945(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of.  20 C.F.R. §§ 404.1520(e), 416.920(e).

occasionally climb ladders/ropes/scaffolds, stoop, kneel, crouch, and crawl; and, frequently climb ramps/stairs and balance. She must avoid concentrated exposure to fumes, odors, dust, gases, poorly ventilated areas, use of/work in close proximity to hazardous machinery, and work at unprotected heights.

(AR 22). Based on the RFC and the VE's testimony, the ALJ concluded at step four that Johnson could perform her past relevant work as a sales clerk, cleaner, and telemarketer, both as the jobs were generally performed and as Johnson actually performed them. (AR 26). Therefore, Johnson's applications for DIB and SSI were denied. (AR 27).

### C.  The Assigned RFC Is Supported by Substantial Evidence

In this appeal, Johnson challenges the RFC assigned by the ALJ, contending that it "lacks evidentiary support as it was based solely on the ALJ's lay interpretation of the medical evidence submitted after [the state agency physicians] reviewed the file." (DE 16 at 4). In tandem, Johnson asserts that the RFC assigned by the ALJ is flawed because she "erroneously rejected the only up-to-date opinion of record"—that of Dr. Hedrick from the Centers for Pain Relief. (DE 16 at 7). Having considered the record and the parties' arguments, the Court finds Johnson's arguments unpersuasive and concludes that the RFC assigned by the ALJ is supported by substantial evidence.

The Seventh Circuit Court of Appeals has explained that "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances." *Clifford*, 227 F.3d at 870 (citations omitted); *see* 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). However, this principle is not absolute, as "a treating physician's opinion regarding the nature and severity of a medical condition is [only] entitled to controlling weight if it is well supported by medical findings and not inconsistent with other substantial evidence in the record." *Clifford*, 227 F.3d at 870 (citation omitted); *see Johansen v. Barnhart*,

314 F.3d 283, 287 (7th Cir. 2002); 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

In the event the treating physician's opinion is not well supported or is inconsistent with other substantial evidence, the Commissioner applies the following factors to determine the proper weight to give the opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. *See Books*, 91 F.3d at 979; 20 C.F.R. §§ 404.1527(c), 416.927(c). The Commissioner must always give good reasons for the weight ultimately applied to the treating source's opinion. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see Clifford*, 227 F.3d at 870.

Although an ALJ may decide to adopt the opinions in a medical source statement concerning the ability of a claimant to perform work-related activities, the RFC assessment is an issue reserved to the ALJ. 20 C.F.R. §§ 404.1545(e), 416.945(e); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996) ("[A] medical source statement must not be equated with the administrative finding known as the RFC assessment."). The RFC is a determination of the tasks a claimant can do despite her limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC assessment:

> is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence, such as observations of lay witnesses of an individual's apparent symptomology, an individual's own statement of what he or she is able or unable to do, and many other factors that could help the adjudicator determine the most reasonable findings in light of all the evidence.

SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996); *see* 20 C.F.R. §§ 404.1545, 416.945. Thus, a medical source opinion concerning a claimant's work ability is not determinative of the RFC assigned by the ALJ. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he

determination of a claimant's RFC is a matter for the ALJ alone—not a treating or examining doctor—to decide." (citing 20 C.F.R. § 404.15279d)); *see* SSR 96-5p, 1996 WL 374183, at *5 (July 2, 1996).

Here, the ALJ considered all of the medical source opinions of record—that of Dr. Kamineni on November 20, 2012; Dr. Bond on December 20, 2012; Dr. Sands on March 27, 2013; and Dr. Hedrick on March 11, 2014. (AR 20, 25-26). The ALJ ultimately assigned "great weight" to the opinions of Drs. Bond and Sands, the reviewing state agency physicians, who found that Johnson could perform a limited range of light work. (AR 26). In doing so, the ALJ explained that these opinions were "consistent with totality of the evidence, including examinations, diagnostic imaging, and the conservative nature of treatment in this case." (AR 26).

As a general principle, "[i]t is appropriate for an ALJ to rely on the opinions of physicians and psychologists who are also experts in social security disability evaluation." *Flener ex rel. Flener v. Barnhart*, 361 F.3d 442, 448 (7th Cir. 2004) (citing 20 C.F.R. § 416.927(f)(2)(i)). "State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation." 20 C.F.R. §§ 404.1527(e)(2)(ii), 416.927(e)(2)(ii).

The ALJ, in contrast, assigned "no significant weight" to the medical source statement of Dr. Kamineni, an examining physician. (AR 26). In doing so, the ALJ explained that Dr. Kamineni's medical source statement was "obviously based on the claimant's own statements." (AR 26 (citing AR 298 ("The patient states that she cannot sit for 30 minutes. She states she

cannot stand for 30 minutes. She states she can carry 20 pounds . . . .")")). The ALJ's proffered

rationale has support in the law. The Seventh Circuit has repeatedly explained that "ALJs may

discount medical opinions based solely on the patient's subjective complaints[.]" *Filus v.

Astrue*, 694 F.3d 863, 868 (7th Cir. 2012) (citing *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th

Cir. 2008)); *see also Dixon*, 270 F.3d at 1177 ("An ALJ may properly reject a doctor's opinion if

it appears to be based on a claimant's exaggerated subjective allegations." (citing *Diaz v. Chater*,

55 F.3d 300, 308 (7th Cir. 1995))).

The ALJ also assigned "little weight" to the medical source statement of Dr. Hedrick, the

pain management physician who saw Johnson twice, both times in November 2013. (AR 25-26).

The ALJ explained that Dr. Hedrick's opinion was inconsistent with his own treatment notes and

the treatment notes of his nurse practitioners, and was also inconsistent with other evidence of

record, including Dr. Miller's treatment notes and Dr. Kamineni's examination findings. (AR

25-26). As explained earlier, an ALJ may discount a treating physician's opinion for the reason

that it is internally inconsistent or inconsistent with other substantial medical evidence of record.

*See Henke v. Astrue*, 498 F. App'x 636, 639 (7th Cir. 2012) ("[T]he ALJ need not blindly accept

a treating physician's opinion—she may discount it if it is internally inconsistent or contradicted

by other substantial medical evidence in the record." (citation omitted)); *Ketelboeter*, 550 F.3d at

625 (noting that an ALJ can discount a treating physician's opinion if it is internally

inconsistent); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004) ("An ALJ may discount a

treating physician's medical opinion if it is inconsistent with the opinion of a consulting

physician, or when the treating physician's opinion is internally inconsistent, as long as he

minimally articulate[s] his reasons for crediting or rejecting evidence of disability." (alteration in

16

original) (citation omitted)).

In challenging the ALJ's consideration of the medical source opinions, Johnson first argues that the ALJ rejected Dr. Hedrick's opinion "[w]ithout specifying any actual inconsistencies." (DE 16 at 7). But that argument has no traction, as the ALJ sufficiently explained how Dr. Hedrick's opinion was inconsistent with his own treatment notes and the documentation of other providers. At the outset, the ALJ observed that Dr. Hedrick had seen Johnson just two times—November 1, 2013, and November 12, 2013—before issuing his March 11, 2014, medical source statement. (AR 26, 343, 345, 368-71). The ALJ explained that Dr. Hedrick's medical source statement of severe limitations was inconsistent with his November 1st note indicating that: (1) Johnson experienced an 40% overall improvement in her ambulation, housework, and sleep; (2) she was tolerating her medications without any side effects; (3) her medications helped to maintain her activities of daily living and her ability to work; and (4) she should perform a regular low impact exercise program. (AR 26 (citing AR 345, 348-49); *compare* AR 370 (indicating that Johnson could stand for only five minutes), *with* AR 349 (instructing her to perform regular, low impact exercise)).

The ALJ further observed that Dr. Hedrick's medical source statement was also inconsistent with other substantial evidence of record. For example, the ALJ observed the contrast between Dr. Hedrick's opinion of severe limitations and the less severe findings in Dr. Miller's treatment notes. (*See* AR 20 (citing AR 309 (Dr. Miller's observation of no tenderness, spasm, or acute distress, but some left thigh weakness), AR 310 (Dr. Miller's documentation of some tingling and numbness in the legs); AR 312 (Dr. Miller's documentation of normal musculoskeletal findings except for some foot tenderness))). Similarly, the ALJ noted the

contrast between Dr. Hedrick's severe limitations and Dr. Kamineni's examination results. (AR 25-26 (*compare* AR 369 (Dr. Hedrick's statement that Johnson's condition affected her reaching, fine and gross manipulation, and pushing/pulling), *with* AR 298-299 (Dr. Kamineni's finding that Johnson had normal fine motor skills))). As such, the ALJ satisfied her duty of minimal articulation when explaining her reasoning for discounting the severe limitations in Dr. Hedrick's medical source statement. In that regard, "an ALJ need not address every piece of evidence in [her] decision. The ALJ need only build a bridge from the evidence to [her] conclusion." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (citations and internal quotation marks omitted); *see Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008) (describing the minimal articulation standard as "a very deferential standard that we have, in fact, deemed 'lax'" (citations omitted)).

Next, Johnson argues that the ALJ inappropriately "played doctor" by considering the records from the Centers for Pain Relief without soliciting an updated opinion from an independent medical expert. More pointedly, Johnson states that the ALJ could not rely on the opinions of Drs. Bond and Sands because they were issued in December 2012 and March 2013, respectively, *before* Johnson began her treatment in June 2013 at the Centers for Pain Relief. As Johnson sees it, her treatment at the Centers for Pain Relief revealed significant new evidence of decreased strength and sensation in her left leg, positive physical examination findings, steroid injections, and pain management treatment—evidence which Drs. Bond and Sands never reviewed. (DE 16 at 4 (citing AR 308-09, 314, 334-35, 343-48, 355-58, 362)).

It is true that "[a]n ALJ cannot play the role of doctor and interpret medical evidence when he or she is not qualified to do so." *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007)

(citations omitted).  Here, however, the ALJ did not "play doctor" by improperly interpreting medical evidence.  Rather, the ALJ considered the limitations opined by Dr. Hedrick and the other evidence from the Centers for Pain Relief for purposes of determining Johnson's RFC—a responsibility which is reserved to the Commissioner.  20 C.F.R. §§ 404.1545(e), 416.945(e).  "The ALJ is charged with making an RFC determination that reflects the *entire* record, not just one doctor's opinion."  *Lemere-Jackson v. Colvin*, No. 3:13-cv-912-CAN, 2014 WL 4656567, at *8 (N.D. Ind. Sept. 17, 2014) (emphasis added).  Accordingly, an ALJ does not impermissibly "play doctor" when defining what limitations should be included in and excluded from a claimant's RFC.  *Id.*; *see Rudicel v. Astrue*, 282 F. App'x 448, 453 (7th Cir. 2008) (rejecting the claimant's argument that the ALJ impermissibly "played doctor" by affording more weight to the limitations opined by the state agency physicians than the limitations opined by her treating specialist); *Jones v. Colvin*, No. 11 C 1608, 2014 WL 185087, at *11 (N.D. Ill. Jan. 13, 2014) (concluding that the ALJ did not "play doctor" by failing to adopt physicians' opinions of the claimant's RFC, where the ALJ offered adequate reasons for rejecting their conclusions).

To the extent that Johnson suggests that the ALJ should have sought an updated opinion from a state agency physician to review the records from the Centers for Pain Relief, the ALJ did not err in declining to do so.  The ALJ has discretion to consult a medical expert, but she certainly is not required to do so.  20 C.F.R. §§ 404.1527(e)(2)(iii), 416.927(e)(2)(iii) ("Administrative law judges may also ask for and consider opinions from medical experts . . . . ).  The applicable regulations and Seventh Circuit case law clearly leave it to the discretion of the ALJ to consult a medical expert when the evidence received is inadequate for the ALJ to determine whether the claimant is disabled.  *See Poyck v. Astrue*, 414 F. App'x 859, 861 (7th

Cir. 2011); *Similia v. Astrue*, 573 F.3d 503, 516 (7th Cir. 2009); *Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007); *Skarbek*, 390 F.3d at 504; 20 C.F.R. §§ 404.1512(e), 416.1512(e). Here, there was no evidentiary deficit. The opinions of Drs. Bond and Sands were issued in December 2012 and March 2013, respectively—well after Johnson's alleged onset date of March 3, 2011. *See, e.g.*, *Miller v. Colvin*, No. 12 CV 50440, 2015 WL 1915658, at *5 (N.D. Ill. Apr. 27, 2015) (rejecting claimant's argument that the ALJ improperly relied on the opinions of the state agency doctors, explaining that there was no evidentiary deficit, and thus, that no additional medical expert was necessary). "[H]ow much evidence to gather is a subject on which [the] court generally respect[s] the [ALJ's] reasoned judgment." *Smith v. Apfel*, 231 F.3d 433, 443 (7th Cir. 2000) (third and fourth alteration in original) (citation and internal quotation marks omitted).

Moreover, "[w]hen an applicant for social security benefits is represented by counsel the administrative law judge is entitled to assume that the applicant is making [her] strongest case for benefits." *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987). Johnson was represented by counsel at the hearing, and counsel did not suggest that a medical expert or additional evidence was necessary to decide Johnson's claim. (AR 34-65); *see Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 679 (7th Cir. 2010) (stating that a claimant who is represented by counsel is presumed to put on her best case, and counsel's failure to request an additional medical opinion supports the inference that it would not have made a difference).

In sum, "when the record contains conflicting medical evidence, the ALJ has an affirmative responsibility to resolve that conflict." *Bailey v. Barnhart*, 473 F. Supp. 2d 842, 849 (N.D. Ill. 2006) (citing *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)). Here, the ALJ

confronted, and then resolved, the conflict between the medical source opinions of record. The ALJ articulated several "good reasons" for assigning greater weight to the opinions of Drs. Bond and Sands and for discounting the more severe restrictions opined by Dr. Hedrick. *See* 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2). The Court will not accept Johnson's plea to reweigh the evidence at this juncture. *See Clifford*, 227 F.3d at 869 ("The Court does] not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] judgment for that of the Commissioner's." (citations omitted)). The Commissioner's final decision will be AFFIRMED.

## V. CONCLUSION

For the foregoing reasons, the decision of the Commissioner is AFFIRMED. The Clerk is directed to enter a judgment in favor of the Commissioner and against Johnson.

SO ORDERED.

Entered this 2nd day of February 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge